REVISED, APRIL 9, 2001

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 99-50775
_____

ONOFRE SERNA,

Plaintiff-Appellee,

v.

THE CITY OF SAN ANTONIO; AL PHILIPPUS,

Defendants-Appellants.

_____

Appeal from the United States District Court
For the Western District of Texas
_____

March 26, 2001

Before JOLLY and DAVIS, Circuit Judges, and RESTANI[*], Judge.

W. EUGENE DAVIS, Circuit Judge:

Onofre Serna, a police officer in the City of San Antonio, Texas, sued the City of San Antonio and its chief of police, Al Philippus, for transferring him to a different unit on the police force in retaliation for his reporting illegal orders issued by his commanding officer. The district court entered a judgment for Serna after a jury returned a verdict for Serna on both his 42

_____

[*]Judge, U.S. Court of International Trade, sitting by designation.

U.S.C. § 1983 claims and his claim under the Texas Public Whistleblower Act, TEX. GOV'T CODE ANN. § 554.001 et seq. (Vernon Supp. 2000) and awarded him $500,000 in damages. Because the evidence at trial was insufficient for a reasonable jury to conclude that Serna suffered an adverse employment action as a result of his transfer, we reverse the judgment of the district court and render judgment for the City and Chief Philippus.

I.

This lawsuit arises out of Serna's service in the Downtown Foot and Bike Patrol Unit of the San Antonio Police Department. Serna joined the unit in 1987, having joined the police force two years earlier. In 1995, when problems in the unit came to a head, the unit was commanded by Captain Rudy Vernon and Lieutenant Harry Griffin. The problems in the unit grew out of friction between some members of the unit and Griffin. In particular, Griffin and several members of the evening shift, of which Serna was a part, did not get along.

In 1995 Griffin called for cover from other officers in his unit while he was detaining a suspect. Four officers, Serna not among them, did not cover Griffin even though they were in a position to do so. These four officers were then transferred out of the unit as a result of their failure to cover Griffin. They filed complaints with the Police Department's equal employment opportunity officer, Linda Taylor, to protest their transfer and to complain about their treatment by Griffin.

Taylor arranged a meeting between Griffin and the members of his unit to try to clear the air after she heard the complaints of the four transferred officers.  The meeting, held in July of 1995, failed to settle the problems in the unit.

Several officers, including Serna, felt that Griffin was giving illegal orders to them.  These orders were, they thought, to harass the homeless and the minority teenagers who frequented downtown, to confiscate alleged gang paraphernalia and not return it to its rightful owner, and to selectively enforce public intoxication statutes against downtown bars that catered to a minority and working class clientele.  These officers, including Serna, complained about these orders at the meeting convened by Taylor in July of 1995.

As a result of continuing tension in the unit, Chief Philippus appointed a special committee to investigate the source of the problems.  The committee interviewed every member of the unit, including Serna, and issued a report in July of 1996.  The committee concluded that a group of officers, Serna prominent among them, were disruptive and encouraged other officers to show disrespect to their supervisors.  The committee also concluded that Griffin was a poor manager and unfairly denigrated the efforts of the evening shift.  To solve the problems in the unit, the committee recommended, in part, that Serna be transferred out of the unit.  Chief Philippus did just that, transferring Serna to a regular patrol unit in July of 1996.

In August of 1996 Serna filed suit against the City in the 37th Judicial District Court in Bexar County, Texas. Serna alleged that he had been transferred in retaliation for reporting Griffin's illegal orders in violation of the Texas Public Whistleblower Act, TEX. GOV'T CODE ANN. § 554.001 et seq. (Vernon Supp. 2000). Serna later amended his complaint to add Chief Philippus as a defendant and to add claims that he had been transferred in retaliation for exercising his rights of free speech, free association, equal protection, and due process in violation of 42 U.S.C. § 1983. The City and Chief Philippus timely removed the suit to federal court.

The district court granted summary judgment to the City and Chief Philippus on Serna's equal protection and due process § 1983 claims. The remainder of Serna's claims were tried to a jury. After nine days of testimony, the jury found for Serna on his Texas Whistleblower Act claim, his free speech § 1983 claim, and his free association § 1983 claim and awarded him $500,000 in compensatory damages. The district court entered judgment for Serna after first lowering the damage award to $475,000 due to a drafting error in the jury form.

The City and Chief Philippus now appeal the judgment entered by the district court on numerous grounds, including that the district court should have granted them judgment as a matter of law because there was insufficient evidence for the jury to find that Serna suffered an adverse employment action as a result of his

transfer.

III.

We review a district court's decision to grant judgment as a matter of law de novo. Travis v. Bd. of Regents of the Univ. of Tex. Sys., 122 F.3d 259, 263 (5th Cir. 1997). In reviewing whether or not there was evidence sufficient to support a jury's verdict we review all the evidence in the record, drawing all reasonable inferences in favor of the non-moving party and without making determinations about the credibility of witnesses or the weight of the evidence. Reeves v. Sanderson Plumbing Prods., __ U.S. __, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000).

To properly preserve review of a jury's verdict based on the sufficiency of the evidence, a party must move for judgment as a matter of law after the close of all the evidence. Bay Colony, Ltd. v. Trendmaker, Inc., 121 F.3d 998, 1003 (5th Cir. 1997); Purcell v. Seguin State Bank and Trust Co., 999 F.2d 950, 956-57 (5th Cir. 1993); McCann v. Tex. City Ref., Inc., 984 F.2d 667, 671 (5th Cir. 1993). If a party does not make such a motion, it can not ordinarily raise the issue of sufficiency of the evidence in its post-verdict motion under Fed. R. Civ. P. 50(b) or on appeal.

In this case the City and Chief Philippus made their motion for judgment as a matter of law after the jury had been charged and had begun deliberations, but before it returned a verdict. Thus, their motion was untimely. However, our court has always approached the requirements of Fed. R. Civ. P. 50 with a, "liberal

-5-

spirit." <u>Alcatel USA, Inc. v. DGI Technologies, Inc.</u>, 166 F.3d 772, 780 (5th Cir. 1999); <u>McCann</u>, 984 F.2d at 671; <u>Davis v. First Nat'l. Bank of Killeen, Tex.</u>, 976 F.2d 944, 948 (5th Cir. 1992). In particular, we have been willing to excuse a failure to strictly comply with the requirements of Fed. R. Civ. P. 50 so long as the purposes of the rule are satisfied. <u>Quinn v. Southwest Wood Prods., Inc.</u>, 597 F.2d 1018, 1026 (5th Cir. 1979).

The facts of this case are closely analogous to those of <u>Quinn</u>. In <u>Quinn</u>, the party moving for judgment as a matter of law made its motion after the jury had been charged and had retired, though before it had begun deliberations. We held that though the motion was untimely, there was nothing in the record to suggest that the moving party intended to gamble on the verdict. The district court accepted the motion and ruled on its merits. We observed that it was still possible to recall the jury and put on more evidence. As such, we considered the moving party's challenge to the sufficiency of the evidence properly preserved. <u>Id</u>. at 1026. In this case, there is also nothing in the record to suggest that the City and Chief Philippus intended to gamble on the jury's verdict. The district court accepted the motion by the City and Chief Philippus over the objection of Serna that it was untimely and ruled on the merits of the motion. R., Vol. 15 at 1795. Serna did not argue that he was being treated unfairly and he made no argument that he would have offered more evidence had the motion been made timely.

-6-

The timing of the motion in this case was anomalous and inconvenient. That the district court chose to rule on the merits of this motion makes this case unique; had the district court rejected the motion as untimely then we would be faced with a very different situation.[1] However, as the district court did not reject the motion as untimely, we are convinced that the City and Chief Philippus did not gamble on the jury's verdict in this case. Because the City and Chief Philippus acted in such a manner as to satisfy the purposes of Fed. R. Civ. P. 50, we hold that their objections to the sufficiency of the evidence are properly preserved for review.

IV.

A party must satisfy four elements to recover on a First Amendment retaliation claim under 42 U.S.C. § 1983. The party must (1) suffer an adverse employment action; (2) show that the speech in question was on a matter of public concern; (3) show that their interest in commenting on matters of public concern outweighs their employer's interest in efficiency; and (4) show that the speech motivated the adverse employment action. Harris v. Victoria Indep. Sch. Dist., 168 F.3d 216, 220 (5th Cir. 1999), cert. denied, 528 U.S. 1022, 120 S.Ct. 533, 146 L.Ed.2d 413 (1999). To recover on a

---

[1]The district court in its post-trial Order Denying Defendants' Motion for Judgment as a Matter of Law or For New Trial found specific issues preserved including whether First Amendment rights were implicated, whether an adverse employment action occurred, qualified immunity, and certain damages issues.

claim under the Texas Public Whistleblower Act a party must satisfy three elements. The party must show (1) a good faith report of a violation of law; (2) that the report was made to an appropriate law enforcement authority; and (3) show a suspension or termination of employment, or other adverse personnel action, as a result of the report. TEX. GOV'T CODE ANN. § 554.002(a) (Vernon Supp. 2000).

Under 42 U.S.C. § 1983 a transfer may, under certain circumstances, constitute an adverse employment action. Our case law is well-developed on the question of when a transfer may qualify as an adverse employment action. See, for example, Breaux v. City of Garland, 205 F.3d 150 (5th Cir. 2000), cert. denied, __ U.S. __, 121 S.Ct. 52, 148 L.Ed.2d 21 (2000); Forsyth v. City of Dallas, 91 F.3d 769 (5th Cir. 1996); Click v. Copeland, 970 F.2d 106 (5th Cir. 1992). The Texas Public Whistleblower Act defines the term personnel action as including, inter alia, a transfer. TEX. GOV'T CODE ANN. § 554.001(3) (Vernon Supp. 2000). Therefore, a party may satisfy the third element of their claim by showing that they suffered an adverse transfer. However, the Texas courts have yet to set out under what circumstances a public employee's transfer can be considered adverse.

Both Serna and the City and Chief Philippus argue that we should define adverse transfer for the purposes of the Texas Public Whistleblower Act by looking to our case law under 42 U.S.C. § 1983. That is, all the parties argue that we should define adverse

-8-

transfer under the Texas Public Whistleblower Act in the same way as we define adverse personnel action under 42 U.S.C. § 1983. Thus, we will measure whether the evidence was sufficient to support the jury's verdict on both Serna's 42 U.S.C. § 1983 claims and his claim under the Texas Whistleblower Act by the standards we have developed under 42 U.S.C. § 1983.

A transfer, even without an accompanying cut in pay or other tangible benefits, may constitute an adverse employment action under 42 U.S.C. § 1983. However, it is insufficient for a plaintiff to show merely that he has been transferred from a job he likes to one that he considers less desirable. Rather, a plaintiff must produce enough evidence to allow a reasonable trier of fact to conclude that, when viewed objectively, the transfer caused harm to the plaintiff, "sufficiently serious to constitute a constitutional injury." Breaux, 205 F.3d at 152. Personnel actions that are commonly considered serious enough to inflict constitutional injury are discharges, demotions, refusals to hire, refusals to promote, and reprimands. Id. at 157; Pierce v. Texas Dep't. of Crim. Justice, Institutional Div., 37 F.3d 1146, 1149 (5th Cir. 1994). A plaintiff must establish that his transfer was equivalent to one of those actions to show that he has suffered an adverse personnel action. Brown v. Brody, 199 F.3d 446, 457 (D.C. Cir. 1999); Harris, 168 F.3d at 221; Forsyth, 91 F.3d at 774; Click, 970 F.2d at 110. To put it somewhat differently, the plaintiff must show that he has suffered some serious, objective, and tangible harm as a result of

his transfer. An important corollary to this rule is that the personal preferences and subjective perceptions of the plaintiff are insufficient to establish that his transfer inflicted a constitutional injury. Forsyth, 91 F.3d at 774.

V.

We now turn to the evidence presented at trial and whether it was sufficient to allow the jury to conclude that Serna's transfer from the Downtown Foot and Bike Patrol Unit to a patrol unit in another part of San Antonio was an adverse personnel action. We conclude that the evidence was not sufficient.

The plaintiff, Serna, and his fellow Officers O'Connor, Froelick, and Messer all testified that they considered the Downtown Foot and Bike Patrol Unit to be a prestigious assignment and that their opinion was generally shared within the San Antonio Police Department. R., Vol. 7 at 112, Vol. 8 at 422, Vol. 9 at 459, 489. For example, Officer O'Connor testified as follows,

> Q. Do you consider the Downtown Foot and Bike Patrol one of the more desirable assignments in the San Antonio Police Department?
> A. Yes, sir.
> Q. Is that pretty well acknowledged as on of the premier assignments in the police department generally?
> A. Generally, yes, sir.

R., Vol. 7 at 112. Chief Philippus also testified that he had once described the Downtown Foot and Bike Patrol Unit as the "best of the best." R., Vol. 9 at 745. Moreover, Officers Hester, Vasquez, and Middleton testified that they thought the tactics used by the Downtown Foot and Bike Patrol Unit made the unit more desirable

-10-

than regular patrol assignments. Regular patrol units had to respond to disturbance calls as assigned by a dispatcher. They had little ability to seek out criminal activity and stop it on their own. The Downtown Foot and Bike Patrol Unit was more "proactive" in that officers were given more freedom to seek out and stop criminal activity on their own. R., Vol. 7 at 79, Vol. 12 at 1239, Vol. 13 at 1526. However, these officers also testified that their preference for the tactics of the Downtown Foot and Bike Patrol Unit was only a matter of personal preference.

Serna testified that Chief Philippus called him a "silent instigator" when he went to him to get some explanation for why he was transferred. R., Vol. 7 at 170. Serna also testified that this label followed him to his new assignment, and that this label would prevent him from ever being promoted in the department. R., Vol. 7 at 175. However, Serna produced no evidence confirming his belief that this label followed him. In particular, he never identified any officer who held this opinion in his new assignment. Nor did he identify any officer who thought any less of his abilities. In fact, every officer who testified to this issue at trial stated that they still thought of Serna as a good officer. Moreover, Serna testified that he had never taken a qualifying examination or other steps to seek a promotion. Indeed, Serna testified that he had not even sought a transfer out of the patrol unit to which he had been transferred. R., Vol. 8 at 339. Finally, Serna's testimony must be considered in light of Officer

-11-

Odell Johnson's testimony. Johnson was also involuntarily transferred out of the Downtown Foot and Bike Patrol Unit after conflict with Griffin, but Johnson sought and won promotion to detective shortly after his transfer. R., Supplemental Vol. at 575.

Serna also testified that, as a result of his transfer, his pension would be substantially reduced as he would retire from the force as soon as he would qualify for a pension. However, such a reduction in his pension would result solely from Serna's desire to retire early. R., Vol. 8 at 353. No other evidence tended to establish any obstacle to Serna's working to the usual retirement age.

The jury was entitled to believe that Serna felt tagged as a trouble maker and stigmatized as a result of his transfer and that he sincerely did not intend to work as long as he had previously intended, even though the City and Chief Philippus introduced evidence that no stigma was intended by the transfer. However, all Serna's testimony established was that he felt stigmatized and injured by his transfer. That is insufficient to prove that, viewed objectively, this transfer was an adverse personnel action.

In sum, all the evidence at trial tended to show was that the Downtown Foot and Bike Patrol Unit was more prestigious than other patrol units and that some officers preferred its tactics to those of other patrol units. There was no evidence to suggest that a transfer to a regular patrol unit was generally considered to be a

demotion or any kind of punishment. Almost every officer who testified at trial testified that they had spent a substantial portion of their career in a regular patrol unit. Some in fact had spent their entire career in a regular patrol unit. Chief Philippus himself testified that he spent four years in a patrol unit before being promoted to detective. R., Vol. 9 at 735. Philippus also testified that most officers would work in a regular patrol unit for some part of their career, and Deputy Chief Richard Gleisner testified that most of the San Antonio Police Department's uniformed officers worked in patrol units. Id.; R. Vol. 10 at 931. Serna can hardly argue that he suffered a constitutional injury when he was transferred to a duty all of his fellow officers performed for some part of their careers.

Serna's days off before he was transferred were Saturday and Sunday; for a short time immediately after his transfer, his days off were Wednesday and Thursday, but he was soon able to change them back to Saturday and Sunday. Serna's hours did change from a 6 pm to 2 am shift to a 10:30 pm to 6:30 am shift. However, nothing in the record shows that Serna was bothered by his new hours or that he attempted to get them changed, as he had with his days off. Serna never suffered a loss in pay or benefits, and he produced no objective evidence that his chances for promotion were reduced by his transfer. All the evidence established was that Serna was transferred from a unit considered prestigious and desirable to another unit on the force, one to which most of his

-13-

fellow officers were assigned.  That is insufficient to establish that Serna suffered an adverse employment action.

In only two cases have we previously held that a plaintiff who had been transferred without an accompanying cut in pay or benefits, or without an accompanying written reprimand, produced sufficient evidence that his transfer could be considered an adverse personnel action by a reasonable trier of fact.[2]  In each case the evidence was considerably more substantial than that in this case.

In <u>Click</u> we held that a reasonable trier of fact could conclude that the transfer of two sheriff's deputies from duty in the law enforcement section of the sheriff's office to duty as jail guards in the detention center was an adverse employment action.  We did so based on several sources of evidence.  First, the assistant director of the jail stated that "everybody" considered transfer from the jail to law enforcement to be a promotion.  Second, the civil service director said that eight people appealed transfers from the law enforcement section to the jail, and only one the other way.  Third, the Sheriff himself stated that all the jail guards would like to be transferred to the law enforcement section if they could.  Fourth, and finally, we held that the two deputies lost certain seniority rights after their transfer.

---

[2]The situation also arose in <u>Sharp v. City of Houston</u>, 164 F.3d 923 (5th Cir. 1999).  However, our review in that case was only for plain error.

Click, 970 F.2d at 110.  There is no evidence in this case that regular patrol assignments were considered punishment or even that they were considered less desirable generally.  No one testified that officers were clamoring to get out of regular patrol assignments.  There was certainly no testimony, unlike in Click, from the Chief or any other senior officer that regular patrol was anything other than a good assignment.

In Forsyth, two detectives in the intelligence unit of the City of Dallas Police Department were transferred to night uniformed patrol after they exposed illegal wiretapping.  We held that the evidence was sufficient for a jury to conclude that the two officers had suffered an adverse employment action.  In particular, we concluded that the evidence tended to show that positions in the intelligence unit were more prestigious, had better working hours, and were more interesting than those in night uniformed patrol.  The evidence also showed that other members of the department had been transferred to night uniformed patrol as punishment.  Forsyth, 91 F.3d at 774.  The factual distinctions between Forsyth and the instant case are clear.  Nothing in the record shows that Serna has ever been bothered by his new working hours or that he has tried to have them changed.  Though some officers did testify that they liked the tactics of the Downtown Foot and Bike Patrol Unit better than those of regular patrol units, that was only a matter of personal preference.  Most importantly, Serna has not shown that transfers from the Downtown

Foot and Bike Patrol to regular patrol were ordered as punishment, either for himself or for anyone else.

VI.

Because Serna produced insufficient evidence to establish that he suffered an adverse employment action as a result of his transfer, Serna may not recover on either his 42 U.S.C. § 1983 claims or his claims under the Texas Public Whistleblower Act. Accordingly, we REVERSE the judgment of the district court and RENDER judgment for the City and Chief Philippus.

REVERSED AND RENDERED.