**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 01-50215
(Summary Calendar)

MARA WILSON,

Plaintiffs-Appellees,

v.

CITY OF SAN ANTONIO,

Defendant-Appellant,

Appeal from the United States District Court
for the Western District of Texas (San Antonio)
(SA-00-CA-338)

August 20, 2001

Before HIGGINBOTHAM, WIENER, and BARKSDALE, Circuit Judges.

PER CURIAM:[*]

Plaintiff-Appellant Mara Wilson appeals the district court's grant of summary judgment in favor of Defendant-Appellee, the City of San Antonio ("City"). Wilson is a female African-American police officer with the San Antonio Police Department ("SAPD"). She brought suit against the City, alleging race and sex discrimination under Title VII of the Civil Rights Act of 1964, 42

_____

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

U.S.C. § 2000e ("Title VII"), and the Texas Commission on Human Rights Act, TEX. LABOR CODE ANN. § 21.051 ("TCHRA"), when she was neither interviewed to fill an opening in SAPD's K-9 (dog handling) unit for which she had applied nor in fact transferred to that unit. The district court granted the City's motion for summary judgment, concluding that Wilson failed (1) to show the presence of one of the elements of her prima facie case for discrimination, namely, that she had suffered an adverse employment decision made by the City, and (2) to establish the existence of a genuine issue of material fact as to whether the City's proffered legitimate, nondiscriminatory reason for its decision was pretextual. Wilson contends that the district court erred when it made these determinations, insisting that it did not view the evidence in the light most favorable to her as the non-moving party. We have now reviewed the record in such a favorable light, and we are satisfied that the City's decisions not to interview Wilson for the K-9 unit position and not to transfer her to the unit do not constitute adverse employment decisions. Therefore, we affirm the district court's grant of summary judgment dismissing Wilson's action.

I. *Facts and Proceedings*

Wilson has been employed by the SAPD as a patrol officer since 1986. In 1994, Wilson requested and was granted a transfer to the K-9 unit, a division of the SAPD's Special Operations Unit ("SOU"), where she was selected to work as a narcotics dog handler.

Things did not go smoothly for Wilson in the K-9 unit. Her first dog, Laika, grew aggressive shortly after Wilson assumed active duty with her. The record is indeterminate as to whether Laika's aggressiveness was at all attributable to Wilson. Nevertheless, after biting a police officer, Laika had to be replaced with a second dog, Herta. In addition, Wilson repeatedly requested changes in her hours, even though the position for which she had applied and was selected had been clearly posted as a 10 a.m. to 6 p.m. shift. Wilson states that she requested the change in shift both for the benefit of having a partner to work with (she was on duty as the only K-9 narcotics dog handler during the daytime shift and believed that she would develop greater skill if she had a partner to work with), and because she had noticed that more calls for a narcotics dog handler came in the afternoon, leaving her and Herta idle in the mornings. To her growing frustration, Wilson's shift change and partnering requests were repeatedly denied. Last, both Wilson and her supervisors realized that she was receiving fewer and fewer calls from other officers to perform searches with Herta, even when Wilson was on duty. Deposition testimony of her supervisors suggests that officers had lost confidence in Wilson's and Herta's abilities to find drugs, that Wilson treated Herta like a pet, that Wilson did not guide Herta through the searches properly, and that the resulting cancellations of requests for her assistance caused an increase in the workload of the other narcotics dog handler in the K-9 Unit.

3

In her deposition, Wilson casts these events in a different light. She maintains that officers would ransack search sites before calling for her and Herta, intentionally sabotaging her search efforts. Her central theme seems to be that SAPD's failure to partner her with another officer or change her shift, her fellow officers' sabotage of the search sites, and their cancellation of calls for her and Herta to search for drugs, were reflections of the supervisors' and other officers' discriminatory attitudes towards her.

Finally, in 1997, when she and her dog failed the required recertification, Wilson was asked to transfer from the K-9 unit. She involuntarily transferred to the Street Crimes Arrest Team, another unit in the SOU, where she has remained as a patrol officer since May 1997. Following this transfer, she filed a charge with the Equal Employment Opportunity Commission (EEOC) alleging race and sex discrimination, and was issued a right-to-sue letter; however, her attorney failed to bring suit timely.

In August 1998, Wilson again applied for a position as a narcotics dog handler in the K-9 unit, this time under a new supervisor, Sgt. Paul Rangel. Nineteen other officers applied as well, including three other females. Sgt. Rangel screened applicants using uniform criteria such as prior work history, recommendations from supervisors, absenteeism, and previous complaints against the applicant. He also conducted an independent investigation into Wilson's previous work history in the K-9 unit

4

before deciding not to grant her an interview. Out of the twenty applicants, Sgt. Rangel invited seven for interviews, three of whom were the other females (two of those three eventually withdrew their applications for personal reasons before being interviewed). The applicant ultimately selected for the position was neither African-American nor female.

In March of 1999, Wilson again filed a charge of discrimination with the EEOC and another with the Texas Commission on Human Rights; and in September of 1999, the EEOC issued Wilson a second right-to-sue letter. This time she timely filed suits in state district and county courts, alleging violations of Title VII and the TCHRA, and intentional infliction of emotional distress, alleging that she was discriminated against on the basis of her race and sex in 1998 when she was neither granted an interview for the K-9 unit position nor transferred back to that unit. The City removed the cases to federal district court, where they were consolidated. The City filed a motion for summary judgment on all claims except those for emotional distress. In January 2001, the district court granted the City's motion, concluding that the decision not to interview or otherwise consider Wilson for the K-9 unit position constituted neither an ultimate employment decision nor an adverse employment action. Although it thus found that Wilson had failed to establish her prima facie case for discrimination, the district court nevertheless proceeded to analyze both the legitimate, nondiscriminatory reasons proffered by

5

the City for its decision, and Wilson's contentions that those reasons were pretextual. The district court ruled in the City's favor on these issues as well, stating that,

> Wilson has failed to present summary judgment evidence that raises a genuine issue of material fact as to whether the stated reason was false and a reasonable inference that Wilson's race and sex were a determinative factor in any adverse employment decision.

Wilson timely appealed the grant of the summary judgment in favor of the City.

## II. *Analysis*

### A. Standard of Review

We review a grant of summary judgment *de novo*, applying the same standard as the district court.[1] A motion for summary judgment is properly granted only if there is no genuine issue as to any material fact.[2] An issue is material if its resolution could affect the outcome of the action.[3] In deciding whether a fact issue has been created, we must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.[4]

The standard for summary judgment mirrors that for

---

[1] Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998).

[2] Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[3] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[4] See Olabisiomotosho v. City of Houston, 185 F.3d 521, 525 (5th Cir. 1999).

6

judgment as a matter of law.[5]  Thus, the court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence.[6]  In reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached.[7]

B. Plaintiff's Prima Facie Case

As noted, Wilson asserted violations of both Title VII and the TCHRA.  It is well settled that in substance the law governing claims under the TCHRA and Title VII is identical,[8] so we may decide the claims under both statutes simultaneously.

To survive defendant's motion for summary judgment in a Title VII discrimination suit, the plaintiff must establish, by a preponderance of the evidence, a prima facie case of discrimination.[9]  This requires the plaintiff to present

---

[5] Celotex Corp., 477 U.S. at 323.

[6] Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000).

[7] Id. at 151.

[8] Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 404 n.2.

[9] Id. at 404 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801-03 (1973)).

evidence that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) someone outside the protected class was chosen for the position in question.[10] If the plaintiff successfully establishes the prima facie case, a presumption of discrimination arises, which the defendant may then attempt to rebut by presenting, through the introduction of admissible evidence, one or more legitimate, nondiscriminatory reasons for the acts complained of by the plaintiff.[11] If the defendant is able to meet this burden, it shifts back to the plaintiff to prove that the defendant's proffered reason is pretextual.[12]

In the instant case, Wilson fails to establish the third element of her prima facie case, that she was subjected to an adverse employment action. Wilson contends that she suffered such adverse treatment in 1998 when she was not granted an interview for the open K-9 unit position or transferred to the unit. In its order granting the City's motion for summary judgement, the district court, citing Dollis v. Rubin,[13]

---

[10] Id. at 404 (citing Ward v. Bechtel Corp., 102 F.3d 199,202 (5th Cir. 1997).

[11] Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981); Meinecke v. H & R Block, 66 F.3d 77, 83 (5th Cir. 1995).

[12] Meinecke, 66 F.3d at 83.

[13] 77 F.3d 777 (5th Cir. 1995).

8

correctly observed that Title VII addresses only adverse employment actions, and does not "address every decision made by employers that arguably might have some tangential effect upon ultimate decisions."[14]  Although we have implied in dicta that Title VII's proscription of employment discrimination may encompass "vague harms" that the statute's retaliation provision does not,[15] we have looked to the Supreme Court's language of Burlington Indus., Inc. v. Ellerth,[16] even in discrimination cases, for guidance as to whether the employer's decision or conduct was actionable.[17]

Without more, a failure to grant an interview for a transfer from one unit in the SOU to another, or a failure to transfer Wilson to that unit without an interview, simply do not rise to the level of "tangible employment actions" envisioned by the Burlington Court.  Wilson nevertheless insists that transfer from the Street Crimes Arrest Team to the K-9 unit would have been more than a lateral transfer,

---

[14] Id. at 781-82.

[15] Shackelford v. Deloitte & Touche, LLP 190 F.3d 398, 406 (5th Cir. 1999) (citing Mattern v. Eastman Kodak Co., 104 F.3d 702, 709 (5th Cir. 1997).

[16] 524 U.S. 742 (1998).

[17] See, e.g., Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 407 (5th Cir. 1999) (citing Burlington, 524 U.S. at 761) ("[A] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").

referring us generally to her own deposition and those of three other officers for support of the proposition. Our review of these depositions convinces us that she alone contends that the move would be more than a lateral transfer. In her brief, Wilson suggests that there is greater prestige associated with the K-9 unit, that it requires specialized training, that a "shift differential" (that is, additional compensation for working evening hours) is available for those who work in that unit, and that there would be greater compensation available as well, if only in the form of an increased budget for K-9 uniforms, equipment, maintenance, and a take-home vehicle.

As we have noted in the context of a § 1983 claim,[18] the mere fact that one unit of a department may be viewed as more prestigious than another will not suffice to render a transfer (or, by analogy, a denial of transfer) an adverse employment action. There must also be some evidence to suggest that a

---

[18] In Sharp v. City of Houston, 164 F.3d 923, 933 n.21 (5th Cir. 1999), we noted that "[t]he definition of 'adverse employment action[]' . . . may be different under title VII from its definition under § 1983," but we also cited to the Burlington "tangible employment action" language referenced above to establish that a demotion is an "adverse employment action" under either rubric. If analogizing between a refusal to transfer an employee to a more prestigious unit and a demotion is appropriate, then the use of § 1983 jurisprudence is appropriate here; and even if the analogy fails, the § 1983 standard is arguably more relaxed and thus more beneficial to the plaintiff. Yet even under the more relaxed standard, the alleged misconduct here fails to rise to the level of an adverse employment action.

10

transfer to the less desirable position(or denial of transfer to the desired position) is generally considered to be a demotion or punishment.[19]

Similarly, in Dollis v. Rubin,[20] we decided that denying the plaintiff's attendance at a training seminar did not constitute an adverse employment action.[21] Even if here such an employment action were deemed adverse, deposition testimony of Wilson's supervising officers establishes that many of the units in the SOU require specialized training:  That feature is not unique to the K-9 unit.

Last, on the issue of compensation, we note Wilson's own deposition testimony that she was receiving shift differential in the Street Crimes Arrest Team assignment, thus calling into question her contention that the availability of shift differential in the K-9 unit would have bettered her position. Moreover, the additional budget items to which she refers merely offset additional expenses. For example, the K-9 maintenance allowance would offset the cost of maintaining the dog, and the additional allowance for the K-9 unit uniform would offset the cost of special clothing and gear.  And even though the assignment of a take-home vehicle could conceivably

---

[19] Serna v. City of San Antonio, 244 F.3d 479, 484 (5th Cir. 2001).

[20] 77 F.3d 777 (5th Cir. 1995).

[21] Id. at 779, 782.

constitute a tangible benefit, taken alone, denying Wilson an interview for, or transfer to, a job that happens to include having such a vehicle at her disposal is not the kind of employment differential protected by Title VII.

In sum, the decision not to interview or transfer Wilson resulted only in the denial of a job to which she subjectively attributed greater prestige, not one from the denial of which she experienced significant economic adversity, if indeed she suffered any at all. As such, Wilson suffered no actionable adverse employment action under Title VII, without which she fails to establish her prima facie case of discrimination. And, absent a prima facie case, our enquiry is at an end, and we can affirm the district court's grant of the City's motion for summary judgment without addressing proffered reasons or pretext.

### III. *Conclusion*

Our plenary review of the record, viewing all facts in the light most favorable to Wilson, satisfies us that the district court did not err in granting the City's motion for summary judgment. We agree that Wilson failed to establish that she was subjected to an adverse employment action, or even that a genuine issue of material fact exists as to that essential element of her prima facie case of race or sex discrimination in her employment. This being the case, we

12

need not inquire further.  The judgment of the district court is, therefore,

AFFIRMED.